UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WILLIAM PALMER,<br><br>                    Plaintiff,<br><br>          v.<br><br>NIPPON YUSEN KABUSHIKI KAISHA<br>(NYK LINE),<br><br>                    Defendant. | Case No.  24-cv-00309-DMR<br><br>**ORDER ON MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 43 |

Plaintiff William Palmer brings this complaint against Defendant Nippon Yusen Kabushiki Kaisha ("NYK Line") pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 905(b) and 933.  [Docket No. 1 (Compl.).]  Defendant filed a motion for summary judgment or, in the alternative, partial summary judgment.  [Docket Nos. 43 (Mot.); 50 (Reply).]  Palmer opposes.  [Docket No. 47 (Opp'n).]  The court held a hearing on August 28, 2025.  For the following reasons, Defendant's motion is granted in part and denied in part.

## I.     FACTUAL BACKGROUND

The following facts are undisputed, unless otherwise noted.

In this negligence case, Palmer sues NYK Line for injuries he sustained when he fell through an open hatch on Defendant's ship on July 27, 2022.  Palmer was a longshoreman who began working in the industry in 2004 and has experience maneuvering around different types of ships.  [Docket Nos. 43-1 (Juliette McCullough Decl., July 22, 2025) ¶ 2, Ex. A; 43-2 (William D. Palmer Dep., Jan. 16, 2024) 22-23, 39.]  At the time of the accident, Palmer was employed by third-party Pacific Crane Maintenance Company, LLC ("PCMC")[1] as a longshoreman.  [Docket

---

[1] PCMC, as an employer of longshoremen, is also referred to as a "stevedore."  Mot. 2.

No. 47-3 (Edward M. Bull III Decl., Aug. 7, 2025) ¶ 16, Ex. O, ECF 158 (PCMC First Report of Injury).]  Specifically, Palmer worked as a refrigerated container mechanic ("reefer"), and his tasks included plugging in refrigerated containers (which are also called "reefers") to the ship's electrical power supply after the containers are loaded onto the ship.  Palmer Dep. 55-57.  On July 26, 2022, the NYK VESTA (the "VESTA"), Defendant's vessel, berthed in Oakland, California. [Docket No. 43-7 (Branko Pirjak Decl., June 12, 2025) ¶ 5.]  According to the captain of the VESTA at the time, Captain Branko Pirjak, the vessel was "turned over" to the stevedore (PCMC) on July 26, 2022 so that the stevedore could perform cargo off-loading and onloading, and the VESTA crew remained away from the cargo and the longshoremen after that point.  Pirjak Decl. ¶¶ 6-12.  Pirjak's declaration states that there is a rule for VESTA crew to remain clear of the areas in which the longshoremen are performing their operations, and this rule is "strictly enforced" by VESTA management.  *Id.* ¶¶ 10-12.

On July 27, 2022, Palmer was assigned to work on the VESTA's reefer cargo.  Palmer Dep. 46-48.  He began work at 7:00 AM.  *Id.* at 47.  At around 1:00 PM, Bay 78[2] had been fully loaded with containers, and Palmer and his fellow reefer Janiero Baltrip boarded the VESTA to work on plugging in the Bay 78 reefers.  *Id.* at 50-53.  The two bays that Palmer and Baltrip would have helped to plug in that day were Bay 78 and Bay 74.  *Id.* at 55.  Each bay had about 36 reefers to plug in—18 containers across that were two rows high.  *Id.* at 55.  Once aboard the ship, Palmer spoke with two PCMC "walking bosses" (supervisors).  *Id.* at 53.  He also saw "mates," but no "lashers."  *Id.* at 54.  In this context, "mates" are VESTA crewmembers.  *Id*.  "Lashers" are PCMC longshoremen whose job is to lash down the containers after they are loaded.  Opp'n 5.

---

[2] The VESTA is segmented into bays.  Bull Decl. ¶ 13, Ex. L.  The group of containers at the very back end ("aft") of the ship is Bay 78, and the next group of containers toward the front of the ship ("forward") is Bay 74.

United States District Court
Northern District of California

1    Palmer arrived at the "lashing bridge" of Bay 78 to work.[3]  Palmer traversed three levels

2  during the relevant time period: the main deck (mooring deck) at the bottom, the lower lashing

3  bridge in the middle, and the upper lashing bridge at the top.  There are two sets of ladders for

4  each level, with a ladder on each end of the bridge, like so:[4]



5

6

7

8

9

10

11    At the top of each ladder is an access hatch that can be opened or closed.  To get to an

12  upper level, one must climb the ladder and open the hatch.  For the access hatches on the lower

13  lashing bridge, the hatches open near the foot of the upper ladder, like so:

 

24  _____

[3] A lashing bridge is a catwalk structure next the cargo containers.  This lashing bridge ran across
the very back end of the ship, left to right (or port to starboard).  While the VESTA was berthed,
the starboard side was called "inshore" (facing the shore) and the port side was called "outshore."
Palmer Dep. 71.  The hatch that Plaintiff fell through was located at "the starboard side of the
farthest aft lashing bridge at Bay 78"—in other words, at the inshore side at the very back end of
the ship.  Cadion Dep. 48.

[4] The image and the colored arrows (red, green, and orange) represent Palmer's path as depicted in
Defendant's motion.  Mot. 2-3.

1    (Photographs of the accident area taken on the date of the accident, labeled NYK_VESTA_000240

2    and NYK_VESTA_000257.  Bull Decl. ¶¶ 14-15, Exs. M, N.)

3        Palmer began his work by climbing the inshore lower ladder from the main deck to the

4    lower lashing bridge (depicted by the path of red arrows above).  Palmer Dep. 56-57.  Palmer

5    opened the inshore lower access hatch and left it open for Baltrip to follow him.  *Id.* at 71.  He

6    then walked along the length of the bridge, preparing the reefer power cords by pulling them out

7    from where they were connected to the reefers.  *Id.* at 56-57.  Baltrip then followed after Palmer to

8    plug the cords into the ship.  *Id.*  Palmer saw that Baltrip had arrived on the lower lashing bridge

9    when Palmer was about halfway through or almost done with the lower lashing bridge.  *Id.* at 62,

10   72.  Palmer did not see Baltrip climb up the lower ladder or close the lower hatch.  *Id.* at 72.

11   Palmer prepared the power cords on the lower lashing bridge, working from inshore to offshore.

12   Palmer Dep. 57-58.  Palmer then climbed the upper offshore ladder to prepare the power cords on

13   the upper lashing bridge from offshore to inshore.  *Id.*  Baltrip did not follow Palmer up to the

14   upper lashing bridge, because the power had to be connected on the lower lashing bridge—instead,

15   Palmer "dropped" the power cords from the upper lashing bridge down to Baltrip.  *Id.* at 72-73.

16       After Palmer was done preparing the power cords on the upper lashing bridge, he

17   descended the upper inshore ladder back down to the lower lashing bridge (depicted by the path of

18   green arrows above).  *Id.* at 58.  At this point in time, the inshore lower access hatch was closed,

19   allowing Palmer to safely step on it.  *Id.* at 74-75.  He could see Baltrip still on the lower lashing

20   bridge, plugging in the power cords.  *Id.* at 58.  Palmer made a second pass along the lower

21   lashing bridge to confirm that, after being plugged in, the power was working properly to cool

22   down the reefers.  *Id.* at 58-59.  He did this by reviewing the readouts on the monitors.  *Id.* at 74.

23   Palmer walked along the lower lashing bridge and confirmed that the power for the lower reefers

24   had no issues.  *Id.* at 58-59, 76.  Palmer then returned to the inshore side and climbed up the ladder

25   to the upper lashing bridge.  *Id.* at 76.  The inshore lower access hatch was closed, allowing

26   Palmer to safely step on it as he began to climb the ladder.  *Id.*  At the time Palmer climbed the

27   ladder, he observed that Baltrip was about midway between the inshore and offshore ladders and

28   was working toward the offshore direction.  *Id.* at 76, 78, 83.  On the upper lashing bridge, Palmer

United States District Court
Northern District of California

4

continued to check the monitors from inshore to offshore. *Id.* at 76-77. About four or five reefers in, Palmer observed that the power was not working correctly for one of the upper reefers. *Id.* He called out to Baltrip and shook the power cord as a signal to Baltrip that there was an issue with the reefer. *Id.* at 77, 80. Baltrip did not respond, and Palmer could not see him. *Id.* at 80. Palmer returned to the upper inshore ladder and descended it. *Id.*

Approximately two minutes elapsed between Palmer climbing up the inshore ladder, checking the four or five reefers on the upper lashing bridge, and returning to descend the same ladder. *Id.* at 123-24. During that time, someone opened the lower hatch beneath that ladder. *Id.* When Palmer descended the inshore ladder toward the lower lashing bridge, he fell down the open hatch at the base of the ladder and landed on the main deck (depicted by the path of the orange arrow above). *Id.* at 80. The distance between the lower lashing bridge and the main deck is approximately nine feet. [Docket No. 47-2 (Katharine A. Sweeney Decl., Aug. 7, 2025) ¶ 2, Ex. A (Sweeney Report) 9.]



(Annotated image of the accident area from Defendant's motion. Mot. 4.)

Palmer testified that when descending a ladder, he looks "down and around," but "might not look under [his] feet." Palmer Dep. 75. He does not always look down before stepping off the

ladder onto the lashing bridge. *Id.* at 76. He testified that when he was descending the ladder before his fall, he was looking "probably straight ahead." *Id.* at 81. Later, however, he testified that he was "looking straight down" as he was coming down the ladder, which is why he did not look to see where Baltrip was. *Id.* at 121. When he reached the lower lashing bridge, he assumed that the hatch was closed, and so stepped off the ladder with both feet at the same time, in a sort of "hop." *Id.* at 82. He did not look down before stepping off the ladder; he admitted that he "should have looked," but did not. *Id.* at 82, 123. He did not look to see if Baltrip was on the lower lashing bridge before his fall. *Id.* at 83. He was not able to see if anyone else was in the vicinity at the time of his fall. *Id.* Upon falling, Palmer was knocked out and seriously injured. Palmer Dep. at 84. He regained consciousness after an unspecified time, and attempted to radio Baltrip, but Baltrip was unable to hear him over the noise of the reefers. *Id.* Palmer then radioed the "lead man" Jerry Gutine for help, and Gutine said help was coming. *Id.*

In a subsequent declaration, Palmer stated that when he was still on the upper lashing bridge, he looked down from the upper hatch to locate the ladder rungs and place his feet. [Docket No. 47-1 (William Palmer Decl., Aug. 5, 2025) ¶ 3.] Palmer declared that he would have been able to see the lower hatch when looking down from the upper hatch and would have seen whether it was open or not if the hatch had been painted yellow. *Id.*

Palmer testified that it is common in his industry for ship crew to "play peek-a-boo" during the reefer plugging-in process. Palmer Dep. 122-23. This refers to a practice where a member of the ship's crew may open a hatch to check the progress of the longshoremen, because the crew needs to double-check that the reefers are plugged in and powered correctly once the longshoremen are done. *Id.* at 123. Palmer speculates that a "peek-a-boo mate" may have opened the hatch that he fell through, but he admits he had no interactions with the VESTA crew on the date of the incident, and did not see any of the VESTA crew "playing peek-a-boo" that day. *Id.* at 122-23.

Janiero Baltrip testified that he arrived on the lower lashing bridge to plug in the reefers on the offshore side. Bull Decl. ¶ 6, Ex. E (Janiero Baltrip Dep., June 18, 2025) 12. He did not recall if he closed the lower hatch behind him but testified that he usually closes it after climbing the

United States District Court
Northern District of California

ladder. *Id.* at 13. He only went through the hatch once to arrive on the lower lashing bridge; he did not go back to the hatch until he had finished plugging in the reefers. *Id.* at 27. He did not see Palmer on the lower lashing bridge, but could hear him directing him about which reefers still needed to be plugged in. *Id.* at 13. Baltrip testified that around the time of the accident, he was plugging in on the offshore side of the lower lashing bridge while Palmer was on the upper lashing bridge checking the power. *Id.* at 15. When Baltrip finished plugging in the offshore reefers, he walked back along the lower lashing bridge and returned to the inshore side. *Id.* He noticed the open hatch and looked down to see Palmer laying on the main deck. *Id.* at 16. When asked if anyone other than himself or Palmer could have opened the hatch, Baltrip testified that "the mates be creeping around all the time." *Id.* at 28. He stated that normally when he is plugging in, the ship's crew "start coming around and they start writing numbers down on their paperwork. . . . I'm pretty sure it's the temperatures and stuff like that, and making sure that the vents are all set up in the right place. Because if they're not, we get a call to come and change something. . . . Usually it's the [ship's] electrician that's keeping track of all that stuff." *Id.* at 30. Baltrip stated that he did not see any crew members on the lashing bridge that day, and that he was not looking at the hatch while he was working. *Id.* at 28.

Herbert Cadion was the Second Officer on board the VESTA at the time of the incident. Cadion testified that on that day, he was working to check that the containers in Bays 74 and 78 were properly stacked and locked to the ship. Bull Decl. ¶ 2, Ex. A (Herbert Cadion Dep., May 16, 2025) 27. He began checking the locks in Bay 78 at around 12:30 PM. *Id.* at 59. It takes him about 25 minutes to finish checking the locks in a bay. *Id.* To check the locks, Cadion had to climb up the hatch to the upper lashing bridge to perform a visual inspection. *Id.* at 28-29. He finished checking Bay 78 and climbed back down the ladder. *Id.* at 59-60. He did not see any longshoremen on board yet because it was still during the 12-1 PM lunch break for the longshoremen. *Id.* There were also no other crewmembers or other people on the Bay 78 aft lashing bridge.[5] *Id.* As such, Cadion left the hatch open in Bay 78 after descending the ladder.

_____

[5] Cadion was inspecting the locks that day along with an able seaman, but the able seaman had "gone forward" and was at Bay 22 at the time of the incident. Opp'n 12.

*Id.* Cadion proceeded to Bay 74 and was in Bay 74 when the longshoremen arrived at Bay 78. *Id.* at 61. Cadion testified that he had just completed checking the locks in Bay 74 and was at Bay 74 forward at the time he was notified of the accident by radio. *Id.* at 27, 32. Cadion went to the scene and found Palmer lying on the main deck below the ladder; an unidentified superintendent was also there. *Id.* at 31. Cadion was instructed to stay away from Palmer and to bring a first aid kit, a neck immobilizer, and a stretcher to the location of the incident, which he did. *Id.* at 30-31.

The gangway watch kept a "Cargo Operation Log" as part of the VESTA's regular business practice. Opp'n 12; Bull Decl. ¶ 11, Ex. J ("Cargo Log"). Cadion confirmed that the log times for the date of the incident are accurate. Cadion Dep. 63. According to the Cargo Log, at 11:40 PM, the longshoremen were reported to have finished loading in Bay 78. Cargo Log. At 12:23 PM, the reefers in Bay 22 were reported to be all OK and in good condition. *Id.* At 1:17 PM, the longshoremen were reported to have finished loading in Bay 74. *Id.* At 1:31 PM, the locks in Bays 74 and 78 were reported to be all OK. *Id.* At 1:42 PM, there was a report that a longshoreman had been injured falling from the lower lashing bridge to the main deck at the Bay 78 aft starboard side. *Id.*

Cadion completed a Statement of Facts after the incident. Opp'n 12; Bull Decl. ¶ 10, Ex. I ("Cadion Statement"). Cadion's Statement of Facts confirms that he learned of Palmer's fall at 1:42 PM from the gangway watch. Cadion Statement 1. Consistent with his deposition, Cadion wrote that he had just completed checking the Bay 74 locks at the time. *Id.* He wrote that he was proceeding to forward (toward the front of the ship) to "conduct mooring & security check" when he received the gangway watch's report. *Id.* He arrived at the scene at 1:43 PM and met a "cargo superintendent" who instructed Cadion not to touch Palmer and to bring a first aid kit. *Id.* Palmer was conscious and talking to a "shore man," but appeared to have suffered a broken skull. *Id.* At 1:45, Cadion arrived with the first aid kit. *Id.* The superintendent instructed Cadion to bring a stretcher and neck collar, and Cadion did so accompanied by the VESTA's chief officer. *Id.* Various staff and superintendents arrived onboard to render assistance while waiting for the

1    paramedics. *Id.* Paramedics arrived around 2:00 PM. *Id.* Palmer was evacuated from the ship at

2    2:20 PM. *Id.* at 2.

3        Cadion testified that it would have been the chief mate's responsibility to maintain the

4    yellow paint around the access hatch. Cadion Dep. 52-53. He testified that it is standard in the

5    merchant marine industry to paint openings such as the access hatch with a high-visibility paint for

6    safety reasons. *Id.* at 54.

7        Jerry Gatine was a PCMC "lead man" and Plaintiff's supervisor. He was at the "reefer

8    compound" when he learned that Palmer had been injured. Bull Decl. ¶ 5, Ex. D (Jerry Gatine

9    Dep., June 16, 2025) 23. Gatine arrived at the scene and saw Palmer laying on his back at the foot

10   of the ladder. *Id.* at 27. The only other person he saw there was a "mate" who was "standing

11   over" Palmer. *Id.* Gatine testified that there was a "language barrier" with the mate and that

12   Palmer was "pretty out of it, not very verbal." *Id.* at 28. Gatine told the mate to back away and

13   the mate quickly complied. *Id.* Then other staff and superintendents arrived and rendered

14   assistance. *Id.* at 27. Gatine stated that Baltrip arrived at the incident after he did, and that Baltrip

15   was on the lower lashing bridge and had to climb down the ladder to reach Palmer. *Id.* at 37.

16   Gatine stated that Baltrip later told him that he "forgot to close . . . the hatch behind him" when he

17   came up the ladder from the main deck to the lower lashing bridge. *Id.* at 36. Gatine also stated

18   that Baltrip was "surprised" by the accident because "he was at the other side of the bay, so he

19   didn't even know it happened until he came down." *Id.* at 40. Gatine confirmed that for Palmer to

20   climb up the ladder to the upper lashing bridge, the lower hatch must have been closed so that

21   Palmer could step on it. *Id.* at 49-50. Gatine also confirmed that it is common industry practice

22   for crewmembers to come to the area where the reefers are plugging in. *Id.* at 60.

23       Captain Pirjak testified that crewmembers are required to close the hatches while people

24   are working in the area. Bull Decl. ¶ 3, Ex. B (Bronko Pirjak Dep., June 23, 2025) 26. He

25   speculated that Palmer left the hatch open himself because in Pirjak's experience, longshoremen

26   "never" close the hatches behind them. *Id.* at 28. He also testified that the crew should not be

27   near any longshoremen while the longshoremen are still working, for various reasons. *Id.* at 31-

28   32. Pirjak testified that to confirm if longshoremen have finished plugging in the reefers,

crewmembers observe them from the main deck. *Id.* at 31. Pirjak testified that there "was no crew at the Bay 78 aft" at the time of the incident, so there was no possibility that a crew member may have opened the hatch. *Id.* at 38. Pirjak agreed that one of the duty officer's[6] responsibilities is to observe the longshoremen and advise the chief officer or the ship electricians that the reefers are plugged in and ready to be checked. *Id.* at 65-66.

Captain Katharine Sweeney provided a declaration and expert report in support of Plaintiff's opposition. Sweeney testified that it is "standard in the industry" that "while it is the job of the longshoremen to plug in the reefer containers as soon as they are loaded, the ship's crew follows closely behind them to ensure that the reefers are plugged in and operating." Sweeney Report 4. Sweeney opined that, assuming the longshoremen and the ship's crewmembers were carrying out their duties and industry standards were adhered to, the person most likely to have been responsible for opening the hatch was Cadion, who would have been checking to see if the reefer plug ins were completed at Bay 78 around the time of the accident. *Id.* Sweeney testified that because of the solid deck configuration of Bay 78 aft, it is impossible to see the reefer outlets from the main deck. *Id.* at 5. Therefore, a person checking the reefer plug ins at Bay 78 must climb up to the lower lashing bridge and open the lower hatch. *Id.*

The NYK Safety Management System rules state that "any permanently fitted structure or fitting which might present a tripping hazard on a walkway should be painted a contrasting color, such as yellow, or in the case of . . . manholes, ringed with black and yellow stripes." Bull Decl. ¶ 12, Ex. K (Rule GOPR-5.14). According to Sweeney, the hatch that Palmer fell through had "notably faded and missing" yellow paint. Sweeney Report 4. Below, the photo on the left shows the condition of the paint surrounding the lower access hatch 45 minutes after the incident (Reply 4); the photo on the right shows the upper access hatch looking down to the lower access hatch and the mooring deck below at the time of the incident (Bull Decl., Ex. M, ECF 153); the bottom photos depict yellow and black-and-yellow tape used to simulate fresh paint around the open hatch

---

[6] According to Palmer, Cadion was the duty officer at the time of the incident, and Defendant does not dispute this. Opp'n 14.

1    (Bull Decl., Ex. M, ECF 150 and 151).

 

 

Sweeney opined that Defendant failed to follow its NYK Safety Management System rules as well as industry custom and practice by allowing the paint around the access hatch to fade. Sweeney Report 5.  Sweeney opined that the hatch located at the base of the ladder and without high visibility paint created "a dangerous trap for even an experienced longshoreman."  *Id.* at 6. Sweeney descended the upper ladder with the lower hatch left open (the hatch was painted yellow during her visit).  *Id.* at 9.  She observed that it was "not easy" to try to descend the upper ladder without stepping into the hole.  *Id.* at 9.  She also observed that it was not obvious while on the ladder that the lower hatch was open, because her upper body obscured her feet, and she was

focused on making sure she had a good grip on the awkward railing leaving the upper lashing bridge rather than looking down below. *Id.* Sweeney also opined that the hatch that Palmer fell through was not compliant with ASTM standards because it did not have an automatic locking and closing mechanism; instead, it had a manual hook and eye mechanism that was more cumbersome to use. *Id.* at 4.

## II.   EVIDENTIARY OBJECTIONS

Defendant raises several objections to Palmer's evidence and expert testimony.  [Docket No. 51 (Obj.).]  At the summary judgment stage, the court may consider evidence if its contents "could be presented in an admissible form at trial," even if the evidence itself may be inadmissible. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (finding that the court could consider the contents of a diary at summary judgment, even if the diary itself would not be admissible at trial).

### A.   Altered Photograph of Hatch

Defendant objects that Palmer's opposition includes an altered photograph that was produced by Defendant but that has been cropped and rotated.  Opp'n 2; Obj. 1.  Palmer does not respond to the objection.  The objection is denied as moot because the court does not rely on the altered photograph to adjudicate this motion.

### B.   Subsequent Remediation Photographs

Defendant objects to photos in Exhibit M to the Bull Declaration which depict the VESTA's condition in July 2025 including bright yellow paint around the hatch (ECF 149 and the right comparison photo in ECF 153).  Federal Rule of Evidence (FRE) 407 states: "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove" negligence, culpable conduct, a defect in a product or its design, or a need for a warning or instruction.  At the hearing, Palmer did not dispute that the bright yellow paint depicted in the photos is a remedial measure.  The court finds that these photos are inadmissible to prove negligence or to prove that the lack of fresh paint was a defect.  However, Palmer may make the same arguments using admissible forms of evidence such as a photo depicting yellow tape around the hatch to simulate fresh paint.  In fact, Palmer

United States District Court
Northern District of California

1    submitted photos depicting high-visibility tape around the open hatch, which the court considers

2    for the purposes of this motion.  Bull Decl., Ex. M, ECF 150 and 151.

3        **C.    Palmer's Declaration**

4        Defendant moves to strike Palmer's declaration as "not supported by his prior sworn

5    testimony."  Obj. 6.  Specifically, Defendant takes issue with Palmer's statement that he is

6    "certain" he would have seen the hatch and would not have fallen if the hatch had been painted

7    around with yellow paint.  Palmer Decl. ¶ 3.  Defendant cites testimony from Palmer's deposition

8    which tends to support Defendant's conclusion that the paint around the hatch would not have

9    made a difference or prevented Palmer's fall.  Defendant argues that Palmer's statement in his

10    declaration that the yellow paint would have prevented his fall contradicts his deposition

11    testimony and is pure conjecture.  Obj. 8.  Defendant's reply cites *Yeager v. Bowlin*, 693 F.3d

12    1076, 1080 (9th Cir. 2012) and argues that Palmer's declaration should be stricken as a "sham"

13    declaration.  Reply 2.

14        "In order to trigger the sham affidavit rule, the district court must make a factual

15    determination that the contradiction is a sham."  *Yeager*, 693 F.3d at 1080 (9th Cir. 2012).  "[T]he

16    inconsistency between a party's deposition testimony and subsequent affidavit must be clear and

17    unambiguous to justify striking the affidavit."  *Van Asdale v. Int'l Game Tech.,* 577 F.3d 989, 998-

18    99 (9th Cir. 2009).  "[T]he non-moving party is not precluded from elaborating upon, explaining

19    or clarifying prior testimony elicited by opposing counsel on deposition [and] minor

20    inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence

21    afford no basis for excluding an opposition affidavit."  *Id.* at 999 (quoting *Messick v. Horizon*

22    *Indus.,* 62 F.3d 1227, 1231 (9th Cir. 1995)).

23        There is not a clear and unambiguous inconsistency between Palmer's deposition

24    testimony and subsequent declaration.  During his deposition, Palmer explained that when he was

25    descending the ladder, he was looking "probably straight ahead," and that he did not look below

26    his feet right before he stepped off the ladder.  Palmer Dep. 81-82, 123.  This does not necessarily

27    contradict Palmer's declaration, which states that he looked down from the upper hatch *before*

28    beginning to climb down the ladder, and that he believes that from his vantage point at the upper

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1    hatch, he would have seen the open hatch on the lower level if it had been painted yellow.  Palmer

2    Decl. ¶ 3.  Palmer did not testify about the yellow paint in his deposition because counsel did not

3    ask him about the yellow paint.  Defendant's motion to strike is denied.

4        The photograph attached to Palmer's declaration depicts inadmissible remedial measures

5    taken after Palmer's fall.  The court does not consider it for purposes of this motion.

6        **D.    Katharine Sweeney Expert Testimony**

7        Defendant raises a *Daubert* challenge to Palmer's expert witness Captain Katharine

8    Sweeney.  Defendant argues that Sweeney is not qualified as an expert; that her methodology is

9    unreliable; and that her opinions regarding violations of the "CSS Code," the "Pacific Coast

10   Maritime Safety Code," and "industry standard" are inadmissible for various reasons.  Defendant

11   also argues that the photographs she included as exhibits are inadmissible.

12       Federal Rule of Evidence (FRE) 702 governs testimony by expert witnesses:

13           A witness who is qualified as an expert by knowledge, skill,
             experience, training, or education may testify in the form of an
14           opinion or otherwise if:

15           (a) the expert's scientific, technical, or other specialized knowledge
             will help the trier of fact to understand the evidence or to determine a
16           fact in issue;

17           (b) the testimony is based on sufficient facts or data;

18           (c) the testimony is the product of reliable principles and methods;
             and
19
             (d) the expert has reliably applied the principles and methods to the
20           facts of the case.

21
22   Fed. R. Evid. 702.  FRE 702 "contemplates a broad conception of expert qualifications," which may

23   be obtained through "knowledge, skill, experience, training, or education."  *Thomas v. Newton Int'l*

     *Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).  "In *Daubert* the Court charged trial judges with the
24
     responsibility of acting as gatekeepers to exclude unreliable expert testimony."  Fed. R. Evid. 702
25
     Adv. Comm. Notes, 2000 Am. (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).
26
     "The rejection of expert testimony is the exception rather than the rule."  *Id.*  "Vigorous cross-
27
     examination, presentation of contrary evidence, and careful instruction on the burden of proof are
28

                                                    14

1    the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509

2    U.S. at 595.

3        "*Daubert* does not require a court to admit or to exclude evidence based on its

4    persuasiveness; rather it requires a court to admit or exclude evidence based on its scientific

5    reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

6    "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the

7    pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the

8    knowledge and experience of the relevant discipline." *City of Pomona v. SQM N. Am. Corp.*, 750

9    F.3d 1036, 1044 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as*

10   *amended* (Apr. 27, 2010)).

### 1.    Qualifications

12       In her expert report, Sweeney states that her "CV and list of cases and publications" are

13   "supplied herewith and incorporated by reference."  Sweeney Report 1.  Plaintiff's filing did not

14   include Sweeney's CV.  On August 21, 2025, the court ordered Plaintiff to file the CV.  [Docket

15   No. 53.]  Plaintiff did so on the same day.  [Docket No. 54 (Edward M. Bull III Supp. Decl., Aug.

16   21, 2025) ¶ 2, Ex. A (Sweeney CV).]

17       Sweeney states that she has "over 20 years of experience sailing on containership vessels

18   as a deck officer as well as a master," and has "worked extensively as a Port Relief Officer (PRO)

19   as the deck officer onboard in charge of cargo operations, discharging and loading containers in

20   various ports in the United States."  Sweeney Report 1.  She is also an auditor under the

21   International Safety Management (ISM) Code, and is a currently credentialed licensed Master

22   Mariner Any Gross Ton, Oceans.  *Id.*  Her CV does not indicate when she worked as a PRO, deck

23   officer, or master, but it does indicate that she has worked as a Certified Lead Auditor for the

24   ISM/International Standards Organization from 2009 to present, including "all types of vessels,"

25   completing over 350 audits.  Sweeney CV.

26       Defendant argues that Sweeney is not qualified to opine on what constitutes an

27   unreasonably dangerous condition for an experienced longshoreman.  Reply 7-8.  Defendant

28   contends that Sweeney is unqualified because, with the exception of one "shift" as a lasher in

United States District Court
Northern District of California

2019, she has not worked as a longshoreman. Obj. 3; [Docket Nos. 51-1 (Christopher A. Tribolet Decl., Aug. 14, 2025) ¶ 2; 51-2 (Katharine Sweeney Dep., Aug. 12, 2025) 25-26]. According to Defendant, this contrasts with *Thomas v. Newton Int'l Enters.,* 42 F.3d 1266, 1269-70 (9th Cir. 1994), in which the Ninth Circuit found that an expert was qualified to opine on unreasonably dangerous conditions for longshoremen because the expert had 29 years of longshore experience in a variety of job categories for numerous stevedoring companies. However, personal experience working as a longshoreman is only one way to meet the expert requirements of FRE 702. "[A]n expert may be qualified either by 'knowledge, skill, experience, training, or education.'" *Thomas,* 42 F.3d at 1269 (quoting Fed. R. Evid. 702). Defendant fails to explain why Sweeney's 20 years of experience sailing on containership vessels, as well as her knowledge and training as a PRO and a safety auditor, would not qualify her to opine on safety conditions for personnel frequently working around a hatch in a lashing bridge, including longshoremen. Sweeney is qualified to offer an opinion on this topic.

Defendant also argues that Sweeney is not qualified to opine on industry standards regarding crew practices on vessels, such as the VESTA, owned and managed by foreign companies. In particular, at the hearing, Defendant attacked Sweeney's qualifications to opine on whether VESTA crew (such as Cadion) would have been following behind the longshoremen to check if the reefers were plugged in and operating. In her deposition, Sweeney admitted that reefer plug-in procedures for American vessels and foreign vessels are different. Sweeney Dep. 27-28. For American vessels, the ship's crew is responsible for plugging in reefers; for foreign vessels, the longshoremen are responsible for plugging in reefers. *Id.* Sweeney admitted she had no experience with the practice on foreign ships related to plugging in reefer containers prior to this case. *Id.* Given these admissions, Sweeney has not established a basis for her expert testimony that crewmembers on foreign ships generally follow behind longshore reefers. The court finds that Sweeney is not qualified as an expert to testify about industry standards for crew practices on foreign vessels related to longshoremen plugging in reefers. Her testimony regarding this topic is stricken.

### 2.    Reliability

Defendant argues that Sweeney's report was not based on a reliable methodology because she "accepted Plaintiff's and his work partner's testimony . . . while rejecting the Second Mate's testimony." Obj. 4.

An expert may not make credibility determinations, "which is the exclusive role of the jury." *Seals v. Mitchell*, No. CV 04-3764 NJV, 2011 WL 1399245, at *9 (N.D. Cal. Apr. 13, 2011) (citation omitted). At the hearing, Palmer conceded that Sweeney's opinion that Cadion most likely opened the hatch amounts to an impermissible credibility determination. The court strikes this opinion.

### 3.    Testimony on Code Violations and Automatic Locking Mechanism

Sweeney opines that Defendant failed to follow "industry standard" in "allowing for a non-automatic locking mechanism" for the hatch that Palmer fell through; that Defendant failed to follow "the requirements of the CSS Code"; and that Defendant failed to follow "the requirements of the Pacific Coast Marine Safety Code Rule 249 and Rule 1045." Sweeney Report 6-8.

Defendant moves to strike these opinions as irrelevant. At the hearing, Palmer conceded that Sweeney's opinions about the hatch locking mechanism are irrelevant to the motion for summary judgment. Therefore, the court does not consider Sweeney's opinions on the hatch locking mechanism.

The court finds that Sweeney's opinions regarding the ladder and manhole design codes are relevant. Evidence of code violations is relevant to whether the unpainted hatch posed an unreasonable danger to an experienced longshoreman. Although Sweeney admitted in deposition that she is not an expert on the CSS Code or Pacific Coast Marine Safety Code, she does not need to be an expert on the specific codes to be able to testify that these codes exist and that the unpainted hatch and ladder design violated the plain language of the codes. Strangely, Defendant also argues that Sweeney's opinions about code violations constitute inadmissible character evidence under FRE 404, which is addressed to evidence of a "person's character." Fed. R. Evid. 404(a) and (b). A ship is not a person. Sweeney's opinion that Defendant's unpainted hatch and ladder design violated the codes is plainly not being offered as inadmissible character evidence.

17

In conclusion, the court strikes Sweeney's expert testimony regarding industry standards for foreign vessels in relation to plugging in reefers; her opinion that Cadion most likely opened the hatch; and her opinion about the locking mechanism of the hatch. The court will consider her other testimony and opinions for purposes of summary judgment.

### 4.    Remediation Photographs

Some of Sweeney's attached photos depict inadmissible remedial measures. For the reasons stated above, the court does not consider them for purposes of this motion.

## III.    LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The court must view the evidence in the light most favorable to the non-moving party. *Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A genuine factual issue exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could return a verdict for the nonmoving party. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248). The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of material fact exists. *Devereaux*, 263 F.3d at 1076. More than a "scintilla of evidence" must exist to support the non-moving party's claims. *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477 U.S. at 252). A showing that "there is some 'metaphysical doubt' as to the material facts as issue" will not suffice. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting

1    *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "Where the

2    record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

3    is no genuine issue for trial."  *Pomona*, 750 F.3d at 1049-50 (quoting *Matsushita*, 475 U.S. at

4    587).

5           As Palmer is the non-moving party, the law requires the court to construe the facts in the

6    light most favorable to Palmer.

7    **IV.    DISCUSSION**

8           Plaintiff brings a LHWCA section 905(b) claim for negligence.  Defendant moves for

9    summary judgment, arguing that Plaintiff has failed to raise any admissible evidence to support

10   liability.  Alternatively, Defendant moves for partial summary judgment as to each of Defendant's

11   duties under the LHWCA, specifically: 1) the turnover duty, 2) the duty to warn, 3) the active

12   control duty, 4) the active involvement duty, and 5) the duty to intervene.

13          **A.    *Scindia* Duties**

14          LHWCA section 905(b) provides that a longshoreman injured in the course of his duties

15   may bring an action against a vessel if the injury was caused by the negligence of the vessel; but

16   no action against the vessel is permitted if the injury was caused by the negligence of the

17   stevedore or longshoreman.  33 U.S.C.A. § 905(b).  The statute abolished the previous scheme in

18   which the shipowner could be liable for claims brought by longshoremen without proof of fault,

19   other than an unsafe, injury-causing condition on the vessel ("unseaworthiness" of the vessel).

20   *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 164 (1981).

21          *Scindia* outlined three general duties owed by a vessel to the longshoreman.  *Scindia*, 451

22   U.S. at 167.  The first is the "turnover duty," which "relates to the condition of the ship upon the

23   commencement of stevedoring operations."  *Howlett v. Birkdale Shipping Co., S.A.,* 512 U.S. 92,

24   98 (1994).  The turnover duty requires that the vessel turn over the ship and its equipment and

25   appliances to the stevedore "'in such condition that an expert and experienced stevedoring

26   contractor, mindful of the dangers he should reasonably expect to encounter . . . will be able by the

27   exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and

28   property.'"  *Id.* (quoting *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404,

United States District Court
Northern District of California

416-417, n.18 (1969)).  It also requires that the vessel warn the stevedore "'of any hazards on the ship or with respect to its equipment,' so long as the hazards 'are known to the vessel or should be known to it in the exercise of reasonable care,' and 'would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.'" *Id.* (quoting *Scindia*, 451 U.S. at 167).

The second duty, which applies once stevedoring operations have begun, provides that "a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.'" *Howlett,* 512 U.S. at 98 (citing *Scindia*, 451 U.S. at 167). A vessel is liable when it either "actively involves itself in the cargo operations and negligently injures a longshoreman," or when it "fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1207 (9th Cir. 1989) (quoting *Scindia*, 451 U.S. at 167).

 The third is the "duty to intervene," which "concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore." *Howlett,* 512 U.S. at 98.  "This duty arises when 1) the vessel is aware of the condition, 2) the vessel should realize the condition presents an unreasonable risk of harm to the longshoremen, and 3) the vessel knows that the stevedore, as a result of an 'obviously improvident' judgment, has failed to remedy the situation." *Bjaranson,* 873 F.2d at 1207.

Plaintiff argues that Defendant breached multiple *Scindia* duties to Plaintiff.  Defendant argues that Plaintiff failed to raise sufficient evidence to support a finding of liability under any of the *Scindia* duties.

### B.    Turnover Duty of Safe Condition

"[T]he Supreme Court in *Scindia* did not state unequivocally that the ship and its equipment must be in a safe condition.  Rather, in preparing the ship for a cargo operation, the vessel must exercise ordinary care in light of the fact that the operation will be conducted by an 'expert and experienced' stevedore.  This implies that certain dangers that may be hazardous to

1  unskilled persons need not be remedied if an expert and experienced stevedore could safely work

2  around them." *Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1207-08 (9th Cir.

3  1989).  Thus, to survive a motion for summary judgment, "the plaintiff must introduce evidence

4  that the hazard was such that an expert and experienced stevedore would not 'be able by the

5  exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and

6  property.'"  *Id.* at 1208 (quoting *Scindia,* 451 U.S. at 167).  Determining whether an unreasonable

7  hazard exists is a fact-intensive inquiry.  *See Thomas v. Newton Int'l Enters*., 42 F.3d 1266, 1271

8  (9th Cir. 1994) (citing *Kirsch v. Plovidba*, 971 F.2d 1026, 1030 (3d Cir. 1992).  "Frequently, this

9  question is one of degree, for the standard is not whether it was absolutely impossible to avoid the

10  hazard, but whether, under all the circumstances, safer alternatives were impractical."  *Kirsch*, 971

11  F.2d at 1030.  "Moreover, there may be cases where the shipowner cannot reasonably expect that a

12  stevedore (and its employees) will avoid an obvious hazard even when practical to do so."  *Id.* at

13  1030-31.  In those circumstances, "the shipowner may be negligent in not eliminating the hazard,

14  although the plaintiff's recovery may be reduced according to his or her comparative fault."  *Id.* at

15  1031.

16      In *Bjaranson*, the plaintiff was injured attempting to climb down a hatch using a coaming

17  ladder at night.  873 F.2d at 1206.  The plaintiff argued that the ship violated its turnover duty of

18  safe condition because the lack of handholds on the coaming ladder made the ladder dangerous.

19  *Id.*  The Ninth Circuit held that the plaintiff failed to meet his burden of proof under the *Scindia*

20  factors because he failed to present any evidence that the hazard was such that an expert and

21  experienced stevedore could not have safely worked around it.  *Id.* at 1208.  The coaming ladder

22  used by the plaintiff was not designed for accessing the hatch.  *Id.* at 1206.  The only reason the

23  plaintiff used the coaming ladder was because his route was partially blocked by a crane operated

24  by longshoremen.  *Id.*  The Ninth Circuit emphasized that the plaintiff could have used different,

25  safer means to traverse the ship, such as asking the crane operator to move out of the way—but the

26  plaintiff chose not to.  *Id.* at 1206, 1208.

27      Similarly, in *Ludwig v. Pan Ocean Shipping Co.,* 941 F.2d 849, 852 (9th Cir. 1991), the

28  plaintiff was injured when he tripped on a coiled cable and snatch blocks located at the bottom of a

ladder. The plaintiff argued that the coiled cable and snatch blocks constituted an unreasonable hazard. *Id.* The plaintiff argued that he could not have reasonably avoided the hazard because, although he knew of the hazard when he climbed the ladder, he momentarily forgot about it when he descended the ladder (and then tripped on the hazard). *Id.* at 851. The Ninth Circuit held that the plaintiff's momentary forgetfulness did not absolve the plaintiff of his responsibility to be aware of the hazard. *Id.* at 851-52. "A longshoreman is an expert who is required to be 'mindful' of hazards—not forgetful of them." *Id.* at 852. The Ninth Circuit emphasized that an experienced stevedore, "mindful of the dangers he should reasonably expect to encounter," could have eliminated the hazard by simply removing the coiled cable and snatch blocks before using the ladder. *Id.* (quoting *Bjaranson*, 873 F.2d at 1208). The plaintiff had presented no evidence that removing the hazard would have been "unduly impractical or time consuming." *Id.* The Ninth Circuit concluded that the ship did not breach its turnover duty of safe condition.

In contrast, in *Martinez v. Korea Shipping Corp.,* 903 F.2d 606, 607 (9th Cir. 1990), the plaintiff was injured when he fell through an unguarded ladder opening[7] on a lashing platform. The Ninth Circuit found a triable dispute of fact as to whether the unguarded ladder opening constituted an unreasonably dangerous condition. *Id.* at 611. The Ninth Circuit emphasized that the ship may be liable for negligence under the LHWCA even if 1) the accident was unprecedented or extraordinary, 2) the ship adhered to industry practice or custom, 3) the hazard was obvious, and 4) the stevedore could have taken steps to prevent the accident. *Id.* at 610-11. The Ninth Circuit noted that, where an accident was caused by a design defect of a ship, "it is possible for both the stevedore and the vessel owner to be negligent." *Id.* at 611. The plaintiff in *Martinez* had presented affidavits from a naval architect and a marine engineer who agreed that the unguarded ladder opening was unsafe, as well as photographs of other vessels that had guardrails around the ladder openings. *Id.* at 609. The Ninth Circuit held that this created a triable dispute of fact regarding whether the unguarded ladder opening presented an unreasonably dangerous work environment to experienced longshoremen exercising reasonable care. *Id.* at 611.

---

[7] The ladder opening was a three foot by three foot circular opening and had no cover or guard rail. *Martinez,* 903 F.2d at 607.

United States District Court
Northern District of California

In *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1268 (9th Cir. 1994), the plaintiff was likewise injured when she felt through an unguarded hatch opening located at the bottom of a ladder. The plaintiff offered expert testimony from a longshore worker with 29 years of experience who opined that the presence of the unguarded hatch opening at the bottom of the ladder was an unreasonable hazard that the plaintiff would not have reasonably anticipated. *Id.* at 1269. The Ninth Circuit found that this expert testimony created a genuine issue of disputed fact sufficient to defeat a summary judgment motion. *Id.* at 1270. The Ninth Circuit stated that "whether a hazard is easily avoidable is simply part of the larger question whether a hazard is unreasonably dangerous. . . . There may be circumstances in which a hazard can be easily avoided but some other factors present make it nonetheless unreasonably dangerous." *Id.* at 1270-71. In *Thomas*, the plaintiff was "climbing backwards down an access ladder, lacked knowledge of the danger beneath her, and . . . would not likely have become aware of the hazard—and thus the possibility of avoidance—through the exercise of reasonable caution." *Id.* at 1272. The Ninth Circuit distinguished *Thomas* from *Ludwig* and *Bjaranson* because those cases involved "plaintiffs faced with choices who voluntarily selected the less prudent alternative." *Id.*

Palmer argues that he has offered substantial evidence to support a jury finding that Defendant did not exercise ordinary care because it failed to maintain the hatch with high visibility paint. Opp'n 21. He asserts there is a dispute of material fact regarding whether the worn-off paint made the hatch so dangerous that an "expert and experienced stevedore" would not be able to carry on cargo operations "with reasonable safety" by "the exercise of ordinary care." *Howlett,* 512 U.S. at 98. Palmer offers supporting evidence through Cadion's testimony, Sweeney's expert testimony, and Palmer's declaration. Cadion testified that it is industry practice for vessels to maintain the high-visibility paint around openings like the access hatch for safety reasons. Cadion Dep. 54. Sweeney testified that the lack of high visibility paint violated custom and practice of the maritime industry, as well as recommendations of the ISM Code and the VESTA's Safety Management System. Sweeney Report 5. Sweeney concluded that the lack of high visibility paint, combined with the hazardous placement of the hatch near the foot of the upper ladder, created "a dangerous trap for even an experienced longshoreman." *Id.* at 6-7. In Palmer's

1    declaration, he testified that if the hatch had been painted with high visibility paint, he would have

2    seen that the hatch was open and would not have fallen through it.  Palmer Decl. ¶ 3.  Palmer also

3    offered photographs of the access hatch from around the time of Palmer's fall and photographs of

4    tape to simulate high-visibility paint.

5          Defendant argues that any "competent longshoreman looking down to confirm whether the

6    hatch was open or closed would have had no problem," regardless of the condition of the paint.

7    Reply 6.  Defendant contends that had Plaintiff looked down, he would have seen that the hatch

8    cover was lifted and would have realized that the hatch was open; therefore, additional yellow

9    paint around the open hatch was unnecessary.[8]  *Id.* at 8.  According to Defendant, the condition of

10   the paint could not have caused Plaintiff's injury because Plaintiff simply did not look down at the

11   hatch before stepping off the ladder.  *Id.*  Defendant argues that the defective condition of the paint

12   would be relevant to a product liability or unseaworthiness claim, but such claims are foreclosed

13   by the LHWCA.  Mot. 17-18.  Defendant cites *Salvato v. Hakko Mar. Corp.,* 718 F. Supp. 1443

14   (N.D. Cal. 1989), where the plaintiff was injured tripping on a padeye affixed to the deck of the

15   vessel.  The plaintiff argued that the vessel was negligent for failing to paint the padeyes a

16   distinguishing color.  *Id.* at 1445.  The court held that this amounted to a design defect argument

17   for which the vessel could not be held liable, because Congress specifically eliminated

18   unseaworthiness liability under the LHWCA.  *Id.*  Notably, the plaintiff in *Salvato* failed to raise

19   any evidence that the unpainted padeyes were so dangerous that an experienced stevedore could

20   not safely work around them.  *Id.*

21         The court must view the evidence in the light most favorable to the non-moving party.

22   *Fresno Motors*, 771 F.3d at 1125.  Palmer must demonstrate a genuine dispute that the danger of

23   the hatch was so great that an experienced stevedore would not "be able by the exercise of

24   reasonable care to carry on its cargo operations with reasonable safety to persons and property."

25   _____

26   [8] Defendant asserts, without evidence, that the top of the hatch cover was painted yellow and
     Palmer should have been able to easily see whether it was open or closed.  Reply 8.  At the

27   hearing, Palmer correctly pointed out that Defendant did not provide a photo of the top of the
     hatch cover from the time of the incident.  As neither party has presented evidence of what the top

28   of the hatch cover looked like at the relevant time, the court cannot consider Defendant's argument
     that the top of the hatch cover was yellow.

*Scindia,* 451 U.S. at 167.  Here, Sweeney points to ways in which the VESTA's access hatch design and lack of high-visibility paint failed to meet industry custom and practice, illustrated by the standards set out in the ISM Code, the VESTA's Safety Management System, and the Code of Safe Practice for Cargo Stowage and Securing.  Sweeney Report 7-8.  Her observations support her expert opinion that the lack of high-visibility paint created a "dangerous trap for even an experienced longshoreman." *Id.* at 6.  As explained above, Sweeney is qualified to make this opinion.  Her testimony creates a dispute of fact whether the hazard was unreasonably dangerous. *Cf. Martinez,* 903 F.2d at 609 (denying the vessel's motion for summary judgment where a naval architect and a marine engineer opined that an unguarded ladder opening was unsafe).

Defendant argues that, even if the access hatch was technically unsafe, Defendant cannot be held liable because the hazard could have easily been avoided if Palmer had just looked down. "[W]hether or not a hazard is so easily avoidable or easily rectifiable that given all of the circumstances present it could not constitute an unreasonably dangerous condition must be factually evaluated on a case-by-case basis." *Thomas*, 42 F.3d at 1271.  Palmer has raised evidence to suggest that it was not reasonable to expect that a longshoreman would look closely at the hatch below him every single time before he stepped off the ladder, even when he believed the hatch was closed.[9]  Sweeney observed that it was "not obvious" that the hatch was open when she descended the ladder because her upper body obscured her feet, and because she was focused on making sure she had a good grip on the railing.  Sweeney Report 9.  Furthermore, a reasonable juror could conclude from the photographs of the access hatch that the lack of high-visibility paint made it significantly more difficult to see if the hatch was open or closed.  A reasonable juror could also conclude from the photographs that the access hatch *was* originally painted yellow, but the paint wore off over time.  Cadion testified that the reason yellow paint is used is to draw attention to the hatch for safety reasons, and this is standard in the industry.  Cadion Dep. 53-54. Plaintiff has raised sufficient evidence to create a genuine dispute that an experienced

---

[9] Defendant also argues that Palmer should have known the hatch was open; but this is a dispute of fact discussed in the Active Involvement Duty section below.  Viewing the evidence in the light most favorable to Palmer, the court must presume for the purposes of this motion that Palmer reasonably believed the hatch was closed when he stepped off the ladder.

1    longshoreman, even exercising reasonable care, may not notice an opening in the floor without the

2    help of high-visibility paint.

3          Finally, Defendant argues that the condition of the paint could not have caused Palmer's

4    injury, because Palmer did not look down and would not have seen the open hole regardless of the

5    condition of the paint.  But Palmer testified that when he looked down the upper hatch to position

6    his feet on the ladder rungs as he began his descent, he "would have seen" the open lower hatch if

7    it had been painted yellow.  Palmer Decl. ¶ 3.  This testimony, in combination with the photograph

8    of the top-down view from the upper hatch to the lower hatch (Bull Decl., Ex. M, ECF 153),

9    creates a genuine dispute of material fact.  Palmer has raised sufficient evidence that the yellow

10   paint would have made a difference such that he would have seen the open hatch while descending

11   the ladder and would have avoided the accident.

12         Genuine disputes of fact exist on the question of whether Defendant breached its turnover

13   duty of safe condition.  Summary judgment is denied as to this duty.

14         **C.     Turnover Duty to Warn**

15         The vessel's turnover duty to warn is "narrow."  *Howlett,* 512 U.S. at 105.  "The duty

16   attaches only to latent hazards, defined as hazards that are not known to the stevedore and that

17   would be neither obvious to nor anticipated by a skilled stevedore in the competent performance

18   of its work."  *Id.*  Defendant argues, among other things, that the condition of the hatch was not a

19   latent hazard because it was open and obvious.  Mot. 14.

20         Plaintiff does not argue that Defendant breached its duty to warn, thereby conceding the

21   issue.  *See, e.g., Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 fn. 4 (9th Cir. 2005) (finding

22   that failure to raise claims in opposition was abandonment of those claims).  The court grants

23   summary judgment as to this duty.

24         **D.     Active Control Duty**

25         The active control duty requires the vessel owner to "avoid exposing the stevedores to

26   harm from hazards they may encounter in areas, or from equipment, under the active control of the

27   ship."  *Christensen v. Georgia-Pac. Corp.,* 279 F.3d 807, 812 (9th Cir. 2002).  In *Christensen*, the

28   Ninth Circuit held that even after the ship was turned over to the stevedore, the shipowner still

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1  retained the responsibility for checking and adjusting the mooring lines. *Id.* at 813.  As such, the

2  lines constituted equipment under the active control of the ship, and the ship had a duty to exercise

3  due care to avoid exposing the stevedores to hazards created by the mooring lines.  *Id.*

4         Palmer misunderstands the scope of the active control duty.  He argues that Defendant

5  breached the active control duty because the paint around the hatch was in the active control of

6  Defendant before the vessel was turned over to PCMC, and Defendant negligently failed to

7  maintain the paint.  Opp'n 24.  The active control duty only applies if the vessel "retained and

8  exercised active control over the area in question" after being turned over, during cargo

9  operations. *Bjaranson*, 873 F.2d at 1209.  There is no evidence that Defendant retained and

10 exercised active control over the paint even while longshoremen were moving about the hatch.

11        The court grants summary judgment as to the active control duty.

12        **E.      Active Involvement Duty**

13        Vessel owners owe a duty of care to the longshoremen if they "actively involve themselves

14 in cargo operations." *Quevedo v. Trans-Pac. Shipping, Inc.*, 143 F.3d 1255, 1259 (9th Cir. 1998).

15 Palmer argues that the VESTA was actively involved in the cargo operations because Cadion

16 opened the Bay 78 hatch that Palmer fell through.  Opp'n 24.  Palmer argues that Cadion's

17 negligence in opening the hatch caused Palmer's fall.  Defendant argues there is no evidence that

18 Cadion opened the hatch.  Defendant does not dispute that if Cadion did in fact open the hatch,

19 Defendant would be liable for breach of the active involvement duty.

20        Defendant attempts to argue that Plaintiff is using inadmissible character evidence to

21 implicate Cadion.  Reply 9.  Defendant points to Palmer's evidence regarding the general practice

22 in the maritime industry of crew members following behind longshoremen while they are plugging

23 in reefers.  FRE 404 states: "Evidence of a person's character or character trait is not admissible to

24 prove that on a particular occasion the person acted in accordance with the character or trait."

25 Fed. R. Evid. 404(a).  Defendant raises a convoluted argument that evidence of common industry

26 practice is somehow barred under FRE 404, but concedes that Palmer's evidence is not character

27 evidence relating to Cadion.  FRE 404 is inapplicable.  The evidence is relevant and admissible.

28        It is undisputed that the times recorded in the VESTA's Cargo Operation Log were

United States District Court
Northern District of California

accurate. According to Palmer's interpretation of the log, Cadion completed checking the locks in Bays 74 and 78 at 1:31 PM. However, Cadion testified that at 1:42 PM, he had just completed checking the Bay 74 locks and was still at Bay 74 forward—a discrepancy of eleven minutes. Cadion Dep. 27, 32. At 1:42 PM, Cadion was notified that Palmer had fallen from the Bay 78 hatch. Cadion Statement 1. Cadion was close enough to the place where Palmer had fallen to be able to arrive one minute later at 1:43 PM. *Id*. Gatine noted that when he arrived at the scene, there was already a "mate" standing next to Palmer. Gatine Dep. 27. A reasonable juror could conclude that Cadion was the "mate" Gatine saw, and that Cadion was first on the scene. Palmer points to testimony from Palmer, Baltrip, and Gatine that consistently indicates it is common across the maritime industry for crewmembers to "play peek-a-boo" and come up into the area where longshore reefers are working to check on their progress. Palmer Dep. 122-23; Baltrip Dep. 28, 30; Gatine Dep. 60. Palmer also points to testimony from Pirjak which suggests that Cadion, as duty officer, was required to check on the progress of the plugging-in at Bay 78. Pirjak Dep. 65-66. Pirjak did testify that the VESTA crew stayed away from Bay 78 while the longshoremen were working there, and that the crew could observe the plugging-in process from the main deck. *Id*. at 31. But Sweeney offered conflicting testimony that due to the configuration of the VESTA, it was not possible for a crew member to check the plugging-in process or the location of the longshoremen without climbing to the lower lashing bridge and opening a hatch. Sweeney Report 5. Based on this evidence and industry practice, Palmer argues a jury could conclude that after Cadion finished checking the locks at 1:31 PM, he went to Bay 78 to check on the progress of the plugging-in, and negligently left the hatch open after he had completed his check.

Defendant's primary argument is that Cadion denies opening the hatch, and the evidence points toward either Baltrip or Palmer having opened it. However, Baltrip and Palmer also deny opening the hatch. The court cannot assess the credibility of witnesses at the summary judgment stage. *City of Pomona*, 750 F.3d at 1049. Viewing the facts in the light most favorable to Palmer, there is sufficient evidence for a reasonable jury to conclude that neither Baltrip nor Palmer opened the hatch. Palmer testified that he stepped on the hatch cover to climb the upper ladder, so he could not have opened it himself. Palmer Dep. 76. Baltrip testified that at the time Palmer

28

ascended the ladder, he was on the offshore side of the lower lashing bridge busily plugging in the reefers, and could not have opened the hatch before Palmer climbed back down.  Baltrip Dep. 15. If it was not Baltrip or Palmer, the parties do not dispute that the only other person in the vicinity who could have opened the hatch was Cadion.  Palmer is not required to definitely prove that Cadion opened the hatch to survive summary judgment.  Palmer need only raise sufficient evidence to create a genuine dispute of material fact.  He has done so.

The court denies summary judgment as to the active involvement duty.

**F.     Duty to Intervene**

Defendant argues that it did not breach the duty to intervene, and Palmer does not dispute it in his opposition.  This issue is conceded.  *See Jenkins*, 398 F.3d at 1095 fn. 4.

The court grants summary judgment as to this duty.

**V.     CONCLUSION**

The court grants partial summary judgment as to the turnover duty to warn, the active control duty, and the duty to intervene.  Summary judgment is denied as to the turnover duty of safe condition and the active involvement duty.

**IT IS SO ORDERED.**

Dated: September 29, 2025

_____
Donna M. Ryu
Chief Magistrate Judge